# United States Court of Appeals

## For the First Circuit

No. 02-1913

FRANCESCO CAMPITI,

Petitioner, Appellant,

v.

JAMES MATESANZ,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,

Lipez and Howard, Circuit Judges.

Dana A. Curhan, by appointment of the court, for petitioner.
Cathryn A. Neaves, Assistant Attorney General, Criminal
Bureau, with whom Thomas F. Reilly, Attorney General, was on brief
for respondent.

June 27, 2003

**BOUDIN**, <u>**Chief Judge**</u>.  This is an appeal from the district court's denial of habeas relief to Francesco Campiti.  The outcome is certain but an opinion is warranted because of several important, potentially recurring issues en route, two of which we decide:  one concerns the timeliness of the appeal and the other the order in which claims of wrongfully withheld evidence are addressed.  The background events in the case can be briefly stated.

Campiti was convicted in Massachusetts state court in March 1989 of drug trafficking.  At trial, two accomplices testified against Campiti.  One, Joseph Rego, testified that he traveled three times with Campiti to Florida in 1986 where Campiti acquired in total five kilograms of cocaine for Rego and others to smuggle back to Boston.  Joseph Labriola reported three more trips in the same year, with Campiti or at his behest, to bring back multiple kilograms of cocaine to Boston.

At trial, the jury also heard audio tapes in which Campiti was heard to tell associates that he had given out "nine" the previous day, this referring (in the prosecution's view) to nine ounces of cocaine and also advising an associate to "talk in riddles."  The jury also learned of a November 1986 search of Campiti's house and the house of another Campiti associate; the latter yielded 412 grams of cocaine.  After the search, the jury

was told, Campiti fled to Florida, having altered his features and assumed a false name.

Following his conviction, Campiti was sentenced to five 10-to-15-year terms in prison, four of which were to be served consecutively. By post-trial motion and then in the Massachusetts Appeals Court, Campiti made various claims including the one central to his appeal in this court: that the prosecutor at trial had failed to reveal useful impeachment information concerning John Mace. Mace was a state police officer who had testified against Campiti at trial by supplying, along with another testifying officer, information that laid the background and served to authenticate the audio tapes played at trial.

The impeachment information derived from an event on October 23, 1989, some seven months _after_ Campiti's conviction. That evening, a young prosecutor, returning late to his office, found Mace burning files and was attacked by Mace with a knife. Mace had been burning records to conceal his embezzlement of funds including, it turned out, some funds relating to Campiti's crimes. Mace was convicted of embezzlement in March 1990. In Campiti's post-trial proceedings and appeal, he argued that the underlying embezzlement--known at the time of trial only to Mace--was

impeachment evidence that had to be disclosed under Brady v. Maryland, 373 U.S. 83 (1963).[1]

The state trial and appeals courts rejected the Brady claim, the latter pointing out that the evidence against Campiti was "voluminous." Campiti v. Commonwealth, 668 N.E.2d 1308, 1322 (Mass. App. Ct. 1994), review denied, 671 N.E.2d 951 (Mass. 1996). Campiti then brought the present habeas action in the federal district court. That court in turn denied relief, saying that Mace was not a critical figure in the trial and that the other evidence against Campiti was strong, Campiti v. Matesanz, 186 F. Supp. 2d. 29, 50-52 (D. Mass. 2002), but it granted a certificate of appealability. We review the district court determination de novo. Nadeau v. Matesanz, 289 F.3d 13, 15 (1st Cir. 2002).[2]

At the threshold, the state asserts that Campiti's appeal is untimely so that we lack jurisdiction. After the district court denied relief on February 28, 2002, Campiti filed a timely motion for reconsideration, tolling the time to appeal; the motion was denied on March 26, 2002, giving Campiti 30 days to appeal. Fed.

---

[1]Campiti suggests that the other officers who testified in support of the audio tapes may also have known about Mace's thieving but turned a blind eye. He points to nothing to substantiate this suggestion.

[2]Under habeas law the underlying state court determinations may be disregarded only to the extent that they are contrary to or an incorrect application of clearly established federal law. See 28 U.S.C. § 2254(d)(1) (2000); McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002) (en banc).

-4-

R. App. P. 4(a)(1), 4(a)(4)(A)(iv).  Before this denial Campiti had sought, and the district court had granted, an extension of 120 days to file this appeal.  Unfortunately, Rule 4 permits an extension of only 30 days after the original 30 days for the appeal expires or the motion is granted, so Campiti had at most until May 28, 2002, to appeal (the first business day after May 25).  Fed. R. App. P.  4(a)(5)(C), 26(a)(3).

Campiti's notice of appeal, filed on July 23, 2002, was therefore untimely unless rescued by some other doctrine or device. An appeal is normally taken by filing in the district court, within the time allowed by Rule 4, a notice of appeal providing specified information (primarily, parties, judgment appealed from, and court to which the appeal is taken).  Fed. R. App. P. 3(a)(1), (c)(1). However, this requirement may be satisfied by the filing of the "functional equivalent," so long as it gives the pertinent information and evinces an intention to appeal.  E.g., Smith v. Barry, 502 U.S. 244, 248-49 (1992).

Here, Campiti relies on both his March 11, 2002, request for an extension of time and his April 19, 2002, request for appointment of counsel.  Whether a particular type of document is the functional equivalent of a notice of appeal may depend on its content and surrounding circumstances rather than on any general rule.  Here, we bypass the question whether the request for an extension satisfies the doctrine, an issue on which the circuits

-5-

have taken different views,[3] because we are satisfied that <u>this</u> request for counsel does meet the requirements.  Under the case caption, the request read:

> I am the petitioner in the above captioned habeas corpus proceeding. My counsel, Vincent Bongiorni, Esq., has been allowed to withdraw by the court.
>
> I am indigent and hereby request that the court appoint counsel to represent me for the purposes of filing a notice of appeal and a request for a certificate of appealability. A financial affidavit is attached for the court's consideration.

This document plainly evidences an intention to appeal. It asks for counsel to be appointed "for the purposes of filing a notice of appeal" and for requesting a certificate of appealability.  See <u>Ray</u> v. <u>Cowley</u>, 975 F.2d 1478, 1478-79 (10th Cir. 1992); <u>United States</u> v. <u>Ward</u>, 696 F.2d 1315, 1318 (11th Cir. 1983).  Admittedly, the document does not specify the judgment appealed from or the appellate court; but here, where no doubt exists as to either, Rule 3 buttressed by latitude for a pro se litigant forgives these "informalit[ies] of form." Fed. R. App. P.

---

[3]<u>Compare</u> <u>Harris</u> v. <u>Ballard</u>, 158 F.3d 1164, 1166 (11th Cir. 1998) (motion for extension insufficient), <u>with</u> <u>Listenbee</u> v. <u>City of Milwaukee</u>, 976 F.2d 348, 350-51 (7th Cir. 1992) (holding opposite).  Our own circuit, in a pre-<u>Smith</u> case, held that a motion for an extension of a time could not be construed as the notice itself.  See <u>Thomas</u> v. <u>Morton Int'l, Inc.</u>, 916 F.2d 39, 40 (1st Cir. 1990) (per curiam).  We have no reason here to consider whether that conclusion survives <u>Smith</u>.

3(c)(4).  See also Torres v. Oakland Scavenger Co., 487 U.S. 312, 316-17 (1988); Grune v. Coughlin, 913 F.2d 41, 43 (2d Cir. 1990).

This brings us to the merits.  Brady relief requires a double showing, namely, that the prosecution wrongly withheld evidence that it should have disclosed and that this caused prejudice to the defendant.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Whether the prosecutor can be deemed to have wrongly withheld information he does not possess where the information is about unrelated crimes committed by his own policeman-witness, is an unusual question with major ramifications. Cf. Kyles v. Whitley, 514 U.S. 419, 438 (1995).  Ordinarily, we would bypass it in a case where--as here--the non-disclosure plainly did not affect the result.

The state, which for future guidance wants a negative answer to the question whether disclosure was required at all, argues that we must decide whether such a rule exists and applies to the case before reaching the prejudice question.  The reasons for the state's concern about future disclosure are obvious; but the state may be wrong in thinking that a bright-line answer can be provided for all cases in which the prosecutor is ignorant but others connected with his side possess exculpatory information.  In all events, the state's claim that we must decide the "wrongful withholding" issue first is ingenious but flatly wrong.

The state bases this priority claim on two Supreme Court cases. One, <u>Teague</u> v. <u>Lane</u>, 489 U.S. 288, 307 (1989), bars habeas relief except in narrow circumstances if the defendant relies on a new rule of constitutional law established after his conviction. <u>See also</u> 28 U.S.C. § 2254(d)(1); <u>Horn</u> v. <u>Banks</u>, 122 S.Ct. 2147, 2151 (2002) (per curiam). The other, <u>Caspari</u> v. <u>Bohlen</u>, 510 U.S. 383, 389-90 (1994), reversed a grant of habeas relief where the circuit court failed to consider the state's argument that the claim rested on a new constitutional rule and therefore that <u>Teague</u> foreclosed a grant of relief. <u>See also</u> <u>Horn</u>, 122 S. Ct. at 2150-51.

Since <u>Caspari</u>, two circuits have rejected the claim that <u>Caspari</u> and <u>Horn</u> create some kind of absolute priority rule, obligating a court to decide <u>Teague</u> issues before others, but one circuit court said that the <u>Teague</u> issue must be resolved first, and another may share the same view.[4] We think that <u>Caspari</u> and <u>Horn</u> have nothing to do with obligatory priorities: in both cases, the lower courts had <u>granted</u> relief without considering seemingly preserved <u>Teague</u> objections--a straightforward merits error compelling reversal. Neither Supreme Court case involved the lower

---

[4]<u>Compare</u> <u>Eaglin</u> v. <u>Welborn</u>, 57 F.3d 496, 499 (7th Cir. 1995) (en banc) <u>and</u> <u>Townes</u> v. <u>Murray</u>, 68 F.3d 840, 847-48 (4th Cir. 1995) (rejecting such claims) <u>with</u> <u>Sweet</u> v. <u>Delo</u>, 125 F.3d 1144, 1155 (8th Cir. 1997), (accepting the claim) <u>and</u> <u>Williams</u> v. <u>Cain</u>, 229 F.3d 468, 472 (5th Cir. 2000) (leaning that way).

-8-

court's <u>denial</u> of habeas relief on some ground that made it unnecessary to reach <u>Teague</u>.

There is no obvious reason why there should be a compulsory priority for <u>Teague</u> issues where the court can resolve the matter on narrower or easier grounds. The suggestion has been made that putting <u>Teague</u> first avoids deciding a constitutional issue, <u>i.e.</u>, whether the alleged new constitutional rule exists, <u>see</u> <u>Townes</u>, 68 F.3d at 855 (concurring opinion). But avoiding constitutional issues is a presumption, not a requirement, <u>e.g.</u>, <u>Harris</u> v. <u>United States</u>, 122 S. Ct. 2406, 2413 (2002), and <u>Teague</u> issues themselves involve readings of constitutional precedent. Further, the avoidance precept itself is beside the point where, as here, the shortcut to the result is a garden variety prejudice issue.

Only as a last resort should the circuit courts read Supreme Court decisions to create such mandatory priorities. A circuit court judge may, in an average circuit, be responsible for 50 full-scale opinions a year and may vote on several hundred merits cases. <u>See</u> 2002 Federal Courts Management Statistics 26. Some circuits have heavier loads as do many district judges. Anything that precludes judges from taking the shortest distance to a result impairs their ability to give truly difficult cases the time they require. In sum, we reject the state's claim that we

must decide whether Teague bars the particular reading of Brady that Campiti proffers.

Turning then to the issue of prejudice, we join both state courts in this case and the district court in concluding that Mace's wrongdoing, even if it had been confessed by Mace on the witness stand, would not have altered the result. The audio tapes did not depend on Mace--a second officer also testified--but even if the tapes had been eliminated from the case, two accomplices gave direct evidence against Campiti and, when his home was searched, he fled from the state and assumed a new identity. The outcome was inevitable.

Affirmed.